EARL S. GWIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 17983.   Promulgated November 20, 1928.

*Elwood Hamilton, Esq.*, for the petitioner.
*L. C. Mitchell, Esq.*, for the respondent.

490

## OPINION.

LITTLETON: The first issue is whether taxable profit was realized by petitioner, a stockholder of the Old Dominion Oil Co., and, if so, how much, in the transactions in which oil leases were acquired from the Cliff Petroleum Co. and the Southwestern Petroleum Co., under an arrangement in which funds were furnished by stockholders of the Dominion Company for the purchase of the leases and later stock was issued by the Dominion Company to these stockholders on account of the funds so furnished. This same transaction was before the Board in *V. J. Bulleit*, 3 B. T. A. 631. On the evidence there presented, we held that the transaction amounted to an investment on the part of the stockholders when the funds were furnished or invested for the acquisition of the leases and that taxable profit arose at the time the stock was issued to the stockholders, the amount of the taxable profit being the difference between the amount invested and the market value of the stock received.

The additional contentions raised and evidence presented which were not before us in the *Bullcit* case were considered by us in the case of *R. V. Board*, another party to the same transaction, which was decided today. On the basis thereof, we affirm our former conclusion that this was a transaction which gave rise to profit and that the fair market value of the stock received was $1.75 a share. This petitioner paid in $3,000 and received on account thereof 6,000 shares of stock. His profit was accordingly $7,500—$10,500 (6,000 shares at $1.75) less $3,000.

The transaction relative to the profit realized by the petitioner in the syndicate operations with respect to the acquisition of the assets of the Hopewell Petroleum Co. by the Belle Point Oil Co. and the sale of the latter corporation's stock by the syndicate was likewise before the Board in *V. J. Bulleit*, 3 B. T. A. 631, a case involving the

profit to be accounted for by V. J. Bulleit as a member of this same syndicate. We there held that the profit to the syndicate was the difference between the cash received by the syndicate in the sale of the stock and the amount paid out of such receipts on account of the obligations assumed under the syndicate agreement plus the value of the stock which the syndicate members had upon the termination of the syndicate operations, such stock being valued at 50 cents a share. In this proceeding, the principal contentions advanced by the petitioner are that the Board was in error in assigning a value of 50 cents a share to the stock which was left in the hands of the members of the syndicate and that the Board should now find that the stock had no market value. While much that appears in the record is confusing and difficult of reconcilement, the parties appear to be in agreement that the petitioner paid in, on account of this transaction, $34,866.51 and received in cash at the end of the syndicate operations, $49,266.66, or a difference of $14,400.15. The petitioner also received as his part of the stock left unsold 50,561 shares. This difference in cash of $14,400.15 was reported as taxable income. In the *Bulleit* case, in determining the total profit to the syndicate, we gave credit for the syndicate expense as well as the amount paid by the syndicate members to make up the $100,000 to be paid to the Belle Point Oil Co., but, seemingly, the parties have agreed on the net results of the transaction, from a cash standpoint, in so far as the petitioner is concerned, and, consequently, have left for our consideration the one question as to the extent to which the profit should be increased on account of the 50,561 shares of Belle Point Oil Co. stock received.

In the *Bulleit* appeal, we found a fair market value for this stock of 50 cents a share. At that time the principal evidence presented was the sales of stock by the syndicate, which, admittedly, may not be a true measure of market value. In this proceeding, additional evidence has been introduced, but much of it is so contradictory and indefinite that it aids us little in arriving at a solution to our problem. Bulleit, the party whose appeal we referred to above, and who was a party to the transaction, testified that the stock had no market value; that "The fair market value of this stock in my judgment, without fixing the number of shares but just in general, was 56 cents per share; that is what it was being sold for; " and that "If we had attempted to sell the stock received, I do not suppose its value would have been 25 cents per share." In his appeal Bulleit alleged that the stock had a fair market value of 40 cents a share. Likewise, his testimony as to the market value of the assets back of the stock is far from conclusive, stating on the one hand that the physical properties did not have a "market value in this section " and on the other hand that "We (the

purchasers) figured (after some investigation) that the property was worth the price we were paying for it." The price here referred to was $200,000 in cash, 200,000 shares of this stock at a " trading value " of 50 cents a share and $60,000 in cash to be derived from oil produced on the properties. The testimony of Balthis, president of the Dominion Company when the Belle Point Oil Co. was taken over, was to the effect that the physical properties had a fair market value not in excess of $100,000, but he testified not only as a lay witness and one who was opposed to the transaction when effected, but also gave little information as to the basis for his valuation. Finally, we have the testimony of the petitioner that the stock was probably worth 20 or 25 cents a share. We also have the fact that when the Belle Point Oil Co. was consolidated, on July 31, 1919, with the Old Dominion Oil Co., four shares of the former were given for one of the latter, and, in disposing of another issue raised in this case, we fixed a value for the Dominion stock of $1.75 a share.

When all of the foregoing factors are taken into consideration, together with the sales of 547,000 shares of stock by the syndicate at 50 cents, to which we referred in the *Bulleit* appeal, we have no difficulty in reaching the conclusion that the petitioner's contention to the effect that the stock had no market value can not be sustained. On the other hand, while reasonable men might well differ as to the market value when we have no sales of stock, other than made by the syndicate, and when such a variety of opinions are offered, we are of the opinion that when all evidence is considered, a value of 43.75 cents is fair and reasonable. This is consistent with the value fixed for the Dominion stock, though all evidence presented necessarily was considered in arriving at this figure. This valuation is made on the basis of the value of the stock at the close of the syndicate operations, though we are of the opinion that the results would not have been different had we followed the petitioner's theory and valued the stock as of February, 1919, when the syndicate operations began. We accordingly find that the petitioner's taxable profit in this transaction was $22,159.81 (50,651 shares at 43.75 cents) plus $14,400.15 (excess of cash received over that contributed), or a total of $36,559.96.

While errors were assigned in the petition with respect to the dividends received by the petitioner from the Old Dominion Oil Co. and the Pyramid Oil Co., both issues are easily disposed of for the reason that the Commissioner has admitted error in taxing the dividends received from the Old Dominion Oil Co., and the petitioner has admitted that, because of his failure to introduce the requisite evidence as to the other dividends, this error must be abandoned. Adjustment should be made accordingly.

With respect to the error assigned on account of the alleged failure of the Commissioner to allow a deduction for $62.50 paid to J. A. Woolfolk, Agent, in 1919, in connection with the sale of the Hopewell Petroleum Co., there now seems to be no disagreement that this is an allowable deduction, but we are unable to say, from the record, whether the petitioner has already had the benefit of the deduction. In his brief the petitioner makes the following statements:

* * * The failure to allow this deduction is set up as an error in the petition but it developed in the hearing that this sum had been allowed by the Commissioner. The error is now abandoned.

On the other hand, the Commissioner disposes of the issue in his brief as follows:

The evidence shows that appellant in 1919 paid $62.50 to J. A. Woolfolk. It also shows that this was an ordinary business expense. Accordingly, appellant is entitled to the deduction.

In this state of agreement as to the deductibility of the item and since the record is not sufficiently complete to enable us to determine what action was taken by the Commissioner, we can merely say that in the determination of the deficiency, this deduction should be allowed, provided the allowance has not already been made.

The only question at issue with respect to the 250 shares of Marden, Orth, Hastings Co. stock which were received by the petitioner as compensation for services rendered by him to the Curd-Blakemore Co. is the value of the stock at the time it was received, the Commissioner having fixed a value of $15 a share whereas the petitioner contends that it had no market value. The only evidence presented on this point was the testimony of the petitioner, who stated that in his opinion, based on investigations which he had made, the stock had only a nominal value; that it might have been a few dollars a share or it might have been $12 or $15 a share; and that the value was probably $5 to $10 a share.

Taking into consideration this entire testimony, we are of the opinion that it does not establish that this stock had no market value, and also that it does not establish a satisfactory basis upon which we might fix a value for this stock. The Commissioner's determination must accordingly be sustained.

As to the deductions claimed on account of the advance made to Moore, our difficulty lies in determining when these debts, in fact, became worthless. The contention made by the petitioner that the debts were ascertained to be worthless in 1920 and 1921, because it was then that the collateral was appropriated by Moore to his own use, would not be conclusive of their worthlessness, even if proved to have occurred in 1920 and 1921, for the reason that apparently

the maker or makers of the notes were liable in their individual capacity for the notes and we have no evidence of their insolvency or inability to pay in 1920 or 1921. The partnership continued in existence until 1924, and as late as 1923 the petitioner wrote a letter to Moore from which it appeared that petitioner expected soon to receive payment. In the absence, therefore, of more convincing evidence as to when the debts were ascertained to be worthless, the Commissioner's determination will not be disturbed.

With respect to the error assigned on account of the failure of the petitioner to report rent received from the Gwin Motor Sales Co. in 1920 in the amount of $3,200, the Commissioner admits, and the evidence establishes, that no such amount was received. The petitioner's contention on this point is accordingly sustained. Similarly, the Commissioner admits, and the evidence establishes, that the deduction claimed in 1920 on account of advances of $1,250 made in 1919 to the Emmett Blevins Co., determined to be uncollectible in 1920, should be allowed.

As to the loss claimed on account of the investment in the Stark Development Co., our difficulty is that the evidence does not show whether the loss occurred in 1921 or a later year. On direct examination, the petitioner stated that cessation of operations and abandonment of the properties occurred in 1921, but on cross-examination he stated that he could not say definitely the year when these events occurred. In the absence of more convincing evidence, we can not grant the allowance. Similarly, the evidence is far from conclusive as to the year in which the loss was sustained on account of the investment in the Royhome Oil Co., the petitioner stating that he thought it occurred in 1921, though he could not be positive of the date.

The final issue in this case is whether the amount of $9,750 received by the petitioner from E. V. Knight is to be considered taxable income to him. At the outset, it should be observed that this involves an affirmative allegation on the part of the Commissioner and, therefore, the burden of proving that this is taxable income rests on him. While the testimony shows that petitioner would not have been paid this amount had he not performed the service of securing the introduction of Clarke to certain government officials, there is nothing to show that because petitioner did this act he had any right to demand of Knight the amount paid, or any other amount. In fact, the testimony of Knight is that there was no understanding that anything was to be paid. Petitioner and Knight had been personal and business friends for many years, and Knight stated that when he received the money from Clarke, he felt that in view of the act done by petitioner, he should share the gift with him. But certainly, there is nothing in the evidence to establish that there was any contract, ex-

press or implied, under which the payment was made, or that this was more than a gratuitous payment. Payments gratuitously made, though on account of some past act or service, do not constitute taxable income. *Herman T. Dietrick*, 6 B. T. A. 1371. We are of the opinion that the Commissioner has not sustained the burden imposed upon him of showing that this amount represents taxable income, and, accordingly, his contention can not be sustained.

*Judgment will be entered under Rule 50.*

*Elwood Hamilton, Esq.*, for the petitioner.
*L. C. Mitchell, Esq.*, for the respondent.